**RESOLUTION TRUST CORPORATION, Plaintiff,**

v.

**Ernest M. FLEISCHER, et al., Defendants.**

**No. 93–2062–JWL.**

United States District Court, D. Kansas.

March 17, 1995.

H. David Barr, Charles J. Williams, Gage & Tucker, Overland Park, KS, William L. Turner, Bernard J. Rhodes, R. Kent Sellers, Jeffrey M. Pfaff, Mike L. Racy, Jean Paul Bradshaw, II, Gage & Tucker, Kansas City, MO, Mira N. Marshall, Robert H. Plotkin, Resolution Trust Corp., Professional Liability Section, Washington, DC, Andrea J. Goetze, N.L.R.B., New Orleans, LA, for Resolution Trust Corp.

James Borthwick, Michael Thompson, Christopher A. Koster, Blackwell, Sanders, Matheny, Weary & Lombardi, Charles W. German, Brant M. Laue, Robert M. Thomp-

son, Rouse, Hendricks, German, May & Shank, Brian C. Fries, Kenner & James, P.C., Kansas City, MO, for Ernest M. Fleischer, Mary Louise Greene, John A. Scowcroft.

Renana B. Abrams, Thomas H. Stahl, Jennifer P. Kyner, Armstrong, Teasdale, Schlafly & Davis, Kathleen A. Hardee, Gilliland & Hayes, P.A., Kansas City, MO, Robert P. Wray, Armstrong, Teasdale, Schlafly & Davis, Olathe, KS, for Duane H. Hall.

John R. Toland, Toland & Thompson, Iola, KS, James Borthwick, Michael Thompson, Blackwell, Sanders, Matheny, Weary & Lombardi, Charles W. German, Brant M. Laue, Robert M. Thompson, Rouse, Hendricks, German, May & Shank, Brian C. Fries, Kenner & James, P.C., Kansas City, MO, for Glenn O. McGuire, Harold Yokum.

Delton M. Gilliland, Coffman, Jones & Gilliland, Lyndon, KS, Charles W. German, Brant M. Laue, Robert M. Thompson, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for Harry T. Coffman.

Richmond M. Enochs, Francis R. Peterson, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Overland Park, KS, for Thomas R. Weigand.

Thomas R. Weigand, Ottawa, KS, pro se.

Thomas E. Gleason Jr., Thomas E. Gleason, Chartered, Ottawa, KS, Charles W. German, Brant M. Laue, Robert M. Thompson, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for Lawrence H. Kramer.

John R. Toland, Toland & Thompson, Iola, KS, Charles W. German, Brant M. Laue, Robert M. Thompson, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for Stanley Dreher, Jr.

Greer S. Lang, Leonard B. Rose, Rose, Brouillette & Shapiro, P.C., Charles W. German, Brant M. Laue, Robert M. Thompson, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for Ted Greene, Jr.

Renana B. Abrams, Thomas H. Stahl, Jennifer P. Kyner, Armstrong, Teasdale, Schlafly & Davis, Kathleen A. Hardee, Gilliland & Hayes, P.A., Kansas City, MO, for Ronald L. Pfost.

James Borthwick, Michael Thompson, Christopher A. Koster, Blackwell, Sanders, Matheny, Weary & Lombardi, Brian C. Fries, Kenner & James, P.C., Kansas City, MO, for Barbara J. Fleischer, Boatmen's First Nat. Bank of Kansas City, Ernest W. Fleischer, Pamela Fleischer, Thomas G. Greene, Larry D. Greene, Gail L. Cluen, Douglas C. Greene, Judith Fleischer, Elizabeth Fredkin.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

### I. INTRODUCTION

In Counts VII and VIII of its first amended complaint, plaintiff Resolution Trust Corporation ("RTC") alleges that various defendants breached certain fiduciary duties and were otherwise negligent in connection with the purchase by Franklin Savings Association ("FSA") of a $30,000,000 promissory note from L.F. Rothschild & Co., Inc. ("LFR"). Defendants Ernest M. Fleischer, Mary Louise Greene and John A. Scowcroft have moved for summary judgment (Doc. # 419) on the ground that plaintiff has suffered no injury, an essential element of its claims. For the reasons set forth fully below, the court finds that questions of material fact preclude a finding that the RTC suffered no actual injury as a matter of law. Defendants' motion for summary judgment is, therefore, denied.

### II. FACTS

The factual background of this case has been developed in the court's previous opinions and to that extent shall not be repeated here. *See, e.g., Resolution Trust Corp. v. Fleischer*, 848 F.Supp. 917, 920 (D.Kan.1994); *Resolution Trust Corp. v. Fleischer*, 826 F.Supp. 1273, 1276 (D.Kan.1993). The following facts are those pertinent to the issues presently before the court and are either uncontroverted or are those facts considered in a light most favorable to the plaintiff for purposes of this motion.

FSA is a stock savings and loan association. Defendants Fleischer, Greene and Scowcroft were directors of FSA until February of 1990. At all times relevant to this motion, more than ninety percent of the out-

1449

standing stock of FSA was owned by Franklin Savings Corporation ("FSC"). FSC filed consolidated federal income tax returns for the Franklin Savings group of companies, which included FSA and various FSA subsidiaries, including Franklin Financial Services, Inc. ("FFS").

On February 22, 1988, FFS loaned $30,000,000 to LFR. In return, LFR issued a note to FFS in the same amount. The loan was made as the first step in the acquisition of LFR ("LFR transaction"). Following the closing of the acquisition of LFR on June 30, 1988, LFR became a member of the consolidated income tax group headed by FSC.

As a result of tremendous losses suffered by LFR during 1987, at the time FFS purchased LFR it possessed certain pre-acquisition net operating loss carryforwards which had a face amount of at least $59,000,000.[1] While defendants contend that these net operating loss carryforwards could be utilized to the benefit of the consolidated income tax group in various ways, it is plaintiff's position that Internal Revenue Service regulations permit their use only for the purpose of offsetting positive taxable income of LFR. Plaintiff contends that the net operating loss carryforwards could not be used to offset positive taxable income of FSA, FFS or any other non-LFR subsidiary.

Defendants contend that before the acquisition of LFR, the Franklin group's management determined that if LFR could be returned to profitability, its future income could be offset by the deductions available. Alternatively, new business operations could be placed in the LFR corporate entity and the profits from those operations offset by the deductions. After two years, LFR could be liquidated all the way upstream and its deductions could then offset otherwise taxable income produced by FSA. In addition, defendants contend that they knew and understood that if LFR was not made profitable immediately, any current losses generated by LFR could be utilized without the restrictions that applied to pre-acquisition loss carryforwards.

In addition to its pre-acquisition net operating loss carryforwards, in February of 1988, LFR possessed certain "built-in losses" which had a face amount of approximately $44,000,000. Defendants refer to these as "book reserves" and contend that the number was as high as $78,500,000.

The LFR transaction closed on June 30, 1988. Pursuant to a February 22, 1988 letter of intent and an April 12, 1988 merger agreement between FFS, L.F.R. Acquisition Company (a wholly owned subsidiary of FFS), L.F. Rothschild Holdings, Inc. ("LFR Holdings") and LFR, LFR Holdings was merged into L.F.R. Acquisition Company, Inc. L.F.R. Acquisition Company, Inc. then changed its name to LFR Holdings. As part of this transaction, FFS contributed the LFR $30,000,000 note to the capital of L.F.R. Acquisition Company, Inc. and the debt was cancelled. L.F.R. Acquisition Company, Inc. then issued $16 million in debentures to the old LFR stockholders, subject to adjustments in the amount due based on LFR's future performance. Because the debentures issued in the LFR transaction were reduced to zero from LFR's post-acquisition losses, the total initial investment in the LFR transaction was $30,000,000.

The RTC conservatorship was imposed on FSA in February of 1990. On January 4, 1991, LFR commenced a bankruptcy proceeding in the United States Bankruptcy Court for the Southern District of New York. FSA was not placed in receivership until July of 1992.

Following LFR's acquisition, it generated the following taxable losses ("post-acquisition losses"):

| Year Ending | Taxable Income (Loss) |
|---|---|
| June 30, 1989 | ($102,008,369) |
| June 30, 1990 | ( $17,656,386) |
| June 30, 1991 | ( $7,417,728) |
| June 30, 1992 | ( $3,377,544) |

Defendants contend that the post-acquisition losses incurred in 1989, 1990 and 1991 and deducted on the Franklin group's federal and state income tax returns in each year respectively, if a 34% tax rate is applied, resulted in an anticipated tax savings of more than $34,000,000 to the Franklin group.

The pre-acquisition LFR tax attributes have not yet been used. According to the defendants, as of August of 1992, there was no need to use the pre-acquisition net operating loss carryforwards because LFR's post-acquisition losses and the FSA losses recorded by the RTC after the February 1990 conservatorship exceeded otherwise taxable income. Nor were the "built-in losses" or "book reserves" used by the FSC consolidated income tax group, at least through June of 1993.

The RTC claims damages to FSA from the LFR transaction in the amount of approximately $40,300,000. In addition to the alleged loss on the $30,000,000 note, the RTC also claims a loss arising from a $5,000,000 loan by FFS to LFR in May of 1988 and from a $5,250,000 advance to the LFR bankruptcy estate. Defendants contend that neither the loan nor the advance is a proper element of the RTC's damages claim. They further assert that the total or overall tax savings to plaintiff as a result of the LFR transaction exceeds $43,300,000.

### III. LEGAL STANDARDS

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anthony v. United States,* 987 F.2d 670, 672 (10th Cir.1993). The court views the evidence and draws any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202

(1986); *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 533 (10th Cir.1994) (citing *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

### IV. DISCUSSION

#### A. Tax Attributes of the LFR Transaction

■ Defendants contend that summary judgment is appropriate because, under Kansas law, any actual damages claimed by the RTC in connection with the LFR transaction are properly offset by benefits to FSA, including tax benefits, attributable to the directors' challenged actions, and the result of the offset is that FSA suffered no injury from the LFR transaction. They claim that the LFR transaction was evaluated in part by the FSA board of directors as an acquisition of transferrable, pre-acquisition tax attributes that would reduce FSA's tax liability and, further, that FSA management knew and understood that post-acquisition losses incurred by LFR would be currently deductible and would also result in a different kind of income tax savings. These deductions, defendants claim, did in fact result in a net gain to FSA far in excess of the $30,000,000 loss suffered by its initial investment in LFR.[2]

■ The theory of offsetting benefits, or the "offsetting benefits rule," applies in Kansas[3] to determine actual damages in tort or breach of contract actions if the defendant has conferred a benefit on the plaintiff that offsets the plaintiff's loss or injury suffered.

---

**2.** Plaintiff is not suing the FSA directors for any losses incurred in operating LFR. The court has already held regarding the "direct investment" issue that the RTC is seeking recovery only for money actually spent by FSA in connection with the LFR transaction and has no standing to sue

derivatively for losses incurred by LFR. *See Fleischer,* 848 F.Supp. at 922–25.

**3.** Plaintiff's claims are brought under Kansas law.

*King Grain Co. v. Caldwell Mfg. Co.,* 820 F.Supp. 569, 573 (D.Kan.1993) (insurance proceeds received as a result of contract breach should reduce plaintiff's damages). When the rule applies, the defendant is permitted to introduce evidence that the plaintiff's alleged injury also resulted in a benefit to plaintiff and, if proved, the plaintiff's damages will be reduced by the amount of the benefit. *Id.* at 574. The Kansas Supreme Court has summarized the rule as follows:

> Basically where the defendant's tortious misconduct or breach of contract causes damages, but also operates directly to confer some benefit upon the plaintiff, the plaintiff's claim for damages may be diminished by the amount of benefit received. [Citation omitted.] The offset theory can only be utilized when the benefits accruing to the plaintiff are sufficiently proximate to the contract to warrant reducing the plaintiff's damages and the failure to do so would permit the plaintiff to obtain unreasonable damages.

*Wichita Federal Sav. & Loan Ass'n v. Black,* 245 Kan. 523, 781 P.2d 707, 719 (1989) (citing *Macon–Bibb County Water & Sewerage Auth. v. Tuttle/White Constr., Inc.* 530 F.Supp. 1048, 1055 (M.D.Ga.1981)). While recognizing the viability of the rule where the defendant's conduct resulted in a direct and immediate savings to the plaintiff, such as in *Macon–Bibb,* no Kansas case has been cited to or located by this court which has discussed applying the concept to alleged benefits derived from tax treatment.

The plaintiff relies on the general rule that tax benefits are not considered in mitigation of damages. *Burdett v. Miller,* 957 F.2d 1375, 1383 (7th Cir.1992); *Fullmer v. Wohlfeiler & Beck,* 905 F.2d 1394, 1402 (10th Cir.1990); *Cereal Byproducts Co. v. Hall,* 16 Ill.App.2d 79, 81–82, 147 N.E.2d 383, 384, *aff'd,* 15 Ill.2d 313, 155 N.E.2d 14 (1958). Most courts addressing the issue of whether tax benefits should be considered in an award of damages, in various kinds of actions, have found that they should not. *See DePalma v. Westland Software House,* 225 Cal.App.3d 1534, 1540, 276 Cal.Rptr. 214, 217 (1990). Courts have often found that whether a plaintiff has received a tax benefit on account of its loss is a matter that concerns only the plaintiff and the government or have viewed tax benefits as a collateral source not to be considered in the damage equation for tortious conduct. *See, e.g., Cereal Byproducts Co.,* 16 Ill.App.2d at 81–82, 147 N.E.2d at 384; *Coty v. Ramsey Assoc., Inc.,* 149 Vt. 451, 462–63, 546 A.2d 196, 204, *cert. denied,* 487 U.S. 1236, 108 S.Ct. 2903, 101 L.Ed.2d 936 (1988); *see also Western–Realco Ltd. Partnership 1983–A v. Harrison,* 791 P.2d 1139, 1147 (Colo.Ct.App.1989); *Rediker v. Chicago, R.I., & Pac. R. Co.,* 1 Kan.App.2d 581, 588–89, 571 P.2d 70 (1977), *cert. dismissed,* 435 U.S. 982, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978). Other courts have reasoned that the apparent benefit from certain tax consequences is rendered illusory by the "tax benefit rule" which, in very general terms, requires that recovery of an amount previously deducted be reported as income in the year received, *Randall v. Loftsgaarden,* 478 U.S. 647, 660, 667, 106 S.Ct. 3143, 3151, 3155, 92 L.Ed.2d 525 (1986); *Burgess v. Premier Corp.,* 727 F.2d 826 (9th Cir.1984); *Danzig v. Jack Grynberg & Assocs.,* 161 Cal.App.3d 1128, 1139, 208 Cal.Rptr. 336, 343 (1984), *cert. denied,* 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 55 (1985); *cf. DePalma,* 225 Cal.App.3d at 1541, 276 Cal.Rptr. at 218, or have reasoned that tax benefits are too speculative to be considered. *See, e.g., Randall,* 478 U.S. at 664–65, 106 S.Ct. at 3153–54; *DePalma,* 225 Cal.App.3d at 1544–45, 276 Cal.Rptr. at 220–21. Thus, in order to accept defendants' theory, the court would have to find that the circumstances of this case justify an exception to this general rule.

Defendants contend that the offsetting benefits theory supplies the appropriate exception because the FSA directors' approval of the acquisition of LFR by FFS conferred a direct benefit on FSA by enabling the Franklin group to include LFR in the consolidated tax return. LFR's losses were then an offset to otherwise taxable income generated for the group by FSA, for which FSA would have been liable under its tax agreements with FSC. The end result, defendants contend, was that FSA retained more profits than it otherwise would have without the FSA directors' action and to ignore that would permit the plaintiff to obtain unreason-

able damages. Defendants' argument has considerable appeal.

In order to examine more closely the validity of defendants' contentions, it is helpful to separate the benefits allegedly received into two categories—potential income tax deductions or savings from pre-acquisition losses sustained by LFR and deductions or savings derived from post-acquisition losses of LFR. While there is certain merit to the argument that potential tax benefits from the pre-acquisition losses suffered by LFR were sufficiently direct and immediate to the LFR transaction to offset the damages claimed by the RTC, the same cannot as easily be said of any benefits derived from LFR's post-acquisition losses which, even if anticipated, did not exist at the acquisition nor were they created by the acquisition. These latter benefits more clearly fall under the general rule's proscription of the consideration of tax consequences and are less directly related to the challenged conduct of the defendants in approving the LFR acquisition.

Defendants have produced evidence that they considered in advance the value of LFR's pre-acquisition losses for purposes of determining income tax liability for the Franklin group companies and anticipated the resulting tax benefits of acquiring such losses. There is evidence that the amount of loss incurred by LFR pre-acquisition was known to defendants and that they ascertained with some certainty the amount of the benefit to be realized. There is some evidence that, if used on the 1989 consolidated federal and state income tax returns, a deduction for pre-acquisition losses would have conferred an actual, present and specific benefit on FSA by reducing its taxable income. Thus, there is evidence that the value of the tax attributes of the preacquisition losses was closely tied to and inseparable from the decision to acquire LFR and that the transaction was capable of generating a direct benefit for the consolidated income tax group.

Under these circumstances, it is appropriate to offset the damages claimed as a result of the LFR transaction by the tax benefits received in order to arrive at an amount which most closely approximates the actual injury suffered. See Macon–Bibb, 530 F.Supp. at 1056 (purpose of compensatory damages is to compensate the plaintiff for injury actually sustained). If the defendants can show that the value of the LFR transaction to FSA was actually enhanced by income tax benefits which could immediately be realized, those benefits should not be ignored in calculating the damages FSA actually suffered from the conduct in issue. Minpeco, S.A. v. Conticommodity Servs., Inc., 676 F.Supp. 486, 488 (S.D.N.Y.1987) (where a plaintiff is both injured and enriched by defendant's wrongful conduct "[it] cannot choose to recover for [its] injuries yet retain [its] windfall."); Apex Oil Co. v. DiMauro, 744 F.Supp. 53, 55–6 (S.D.N.Y.1990) (same). Given that there is evidence that the LFR transaction was motivated by the directors' desire to shelter from tax liability certain income of FSA and specifically to realize certain tax benefits from the then existing losses of LFR, it is reasonable to offset the amount of injury plaintiff claims to have suffered by the anticipated and realized tax benefits of that investment. See Burdett, 957 F.2d at 1383 (court held it was unreasonable for plaintiff to claim as damages the anticipated and realized tax benefits of tax shelters and required that plaintiff's award be offset by the benefit realized).[4] To ignore tax benefits that the plaintiff bargained for and received as a result of the investment could permit the plaintiff to obtain unreasonable damages. See Macon–Bibb, 530 F.Supp. at 1055 (where offsetting benefits rule may be applicable, it should be applied

---

4. In Burdett, the Seventh Circuit held that while the tax benefit of the loss of an investment due to a defendant's wrongful conduct, if any, is not subtracted from the damages incurred, the tax benefit of the tax shelter itself should be subtracted. Burdett, 957 F.2d at 1383–84; Pucci v. Litwin, No. 88–C–10923, 1993 WL 405448, at *2 (N.D.Ill. Oct. 4, 1993). Writing for the court, Judge Posner compared the claim for a loss, which did not account for the anticipated and realized tax benefits of a tax shelter, to that for a $100,000 loan, half of which was repaid. Burdett, 957 F.2d at 1383. He stated, "[t]he essential point is that with regard to benefits of whatever sort received, there is no injury, so no basis for a claim of damages." Id. That reasoning is persuasive here.

only if the failure to do so would permit the plaintiff to obtain unreasonable damages).

Neither Kansas courts nor the Tenth Circuit has addressed this precise issue. This court recognizes that the existing authority leaves it unclear whether these courts would, in fact, consider tax savings from a tax shelter type investment an appropriate offset to damages claimed in a breach of fiduciary duty or negligence action under Kansas law. *See Fullmer,* 905 F.2d at 1402 (refusing to reduce plaintiffs' claimed damages by the amount of tax benefit, if any, received even though plaintiffs argued that the tax benefits were expected) (citing *Cereal Byproducts Co.,* 16 Ill.App.2d at 81–82, 147 N.E.2d at 384 (refusing to reduce damages for accountants' negligence in not discovering embezzlement of plaintiff by amount of tax benefits plaintiff received by virtue of theft) and *Randall,* 478 U.S. at 660, 667, 106 S.Ct. at 3151, 3155 (refusing tax benefit offset in securities fraud case)); *Anixter v. Home–Stake Prod. Co.,* 977 F.2d 1549, 1553–54 & n. 6 (10th Cir.1992) (defendants were not entitled to reduction of damages for securities fraud based on tax benefits which plaintiffs received from losses), *cert. denied sub nom. Dennler v. Trippet,* —— U.S. ——, 113 S.Ct. 1841, 123 L.Ed.2d 467 (1993); *Cascade Energy & Metals Corp. v. Banks,* 896 F.2d 1557, 1581 (10th Cir.1990) (recognizing split of authority regarding whether tax consequences may potentially be considered in computing damages in certain circumstances), *cert. denied sub nom. Weston v. Banks,* 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990); *see also Wichita Federal,* 245 Kan. 523, 781 P.2d at 707 (Kansas Supreme Court recognized the theory of offsetting benefits but was not asked to apply it to tax benefits).

On balance, this court concludes that if the Supreme Court of Kansas were presented with this question, it would permit the defendants to offer evidence of the tax consequences of the pre-acquisition losses in an attempt to offset the plaintiff's claimed damages here. This case does not present the classic "tax benefits" rule situation such as was dealt with in cases like *Rediker,* 1 Kan. App.2d at 588–89, 571 P.2d 70, and *Fullmer,* 905 F.2d at 1402. It is also different from *Anixter,* which declined to look at supposed tax benefits from intangible drilling expenses in a securities fraud case. 977 F.2d at 1553–54. None of the reported cases close the door on applying the offsetting benefits rule where, as here, anticipated tax benefits of the investment were directly created by the very conduct which is under attack as negligent or a breach of fiduciary duty. The very well reasoned, and relatively recent, opinion from the Seventh Circuit in *Burdett* shows why such evidence should be permitted, and this court believes that Kansas would follow that approach.

■ By contrast, the court finds that any tax benefits attributable to post-acquisition losses of LFR may not be used to offset any damages claimed by the RTC in connection with the LFR transaction. Those benefits cannot reasonably be considered sufficiently proximate to the decision to commit to the LFR transaction such that they may be used as an offset to any damage claim. *See Wichita Federal,* 245 Kan. 523, 781 P.2d at 707 (offset theory can only be utilized when the benefits accruing to the plaintiff are sufficiently proximate to the contract to warrant reducing the plaintiff's damages) (citing *Macon–Bibb,* 530 F.Supp. at 1055).

The defendants admit that it was their intention that LFR operations be returned to profitability. Thus, while it was believed that some losses would be suffered before LFR could be profitable, at the time of the decision to acquire LFR, the post-acquisition losses were not intended to be utilized as a tax shelter for FSA income in the same manner as the pre-acquisition losses. While potential tax benefits attributable to LFR's pre-acquisition losses could be identified with some measure of accuracy and their value reasonably estimated at the time the LFR transaction was complete, making their value more immediately and directly related to the intrinsic value of the LFR investment, any potential tax benefit from the post-acquisition losses was speculative at best. An attempt to quantify and rely on that potential at the time of the initial LFR investment became increasingly and hopelessly speculative with each future tax year contemplated. *Cf. Randall,* 478 U.S. at 665, 106 S.Ct. at 3154

(Supreme Court recognized "formidable difficulties in predicting the ultimate treatment of the investor's claimed tax benefits . . . and that the burdens associated with reconstruction of the investor's tax history for purposes of calculating interest are substantial.")

■ The state of affairs as of 1992 is conclusive evidence that an attempt to determine the post-acquisition operating losses and any attendant tax benefits at the time of the LFR transaction was at best speculative. Contrary to what was anticipated, LFR did not return to profitability and continued to suffer losses through 1992. In light of the fact that LFR already possessed substantial pre-acquisition tax attributes that could offset taxable income of either LFR or the consolidated income tax group, it is far from clear that post-acquisition net operating losses, to the extent incurred, were either fully anticipated or desirable. Where doubts exist regarding the existence or effect of an alleged benefit, those doubts "should be resolved against the tortfeasor, and he should have no credit for remote and uncertain 'benefits', especially if they are unwanted." Dan D. Dobbs, Law of Remedies § 3.6, at 182 (1973).

■ Moreover, the court has found that the RTC has no standing to sue a defendant on the basis that he or she acted negligently or breached a fiduciary duty with respect to his or her duties as a director of one of the subsidiary corporations. *See Fleischer*, 848 F.Supp. at 922–25. Rather, the RTC has standing to pursue its allegations that the FSA directors were negligent or breached a fiduciary duty in authorizing the acquisition and continued funding of LFR and other subsidiaries. *Id.* Any tax benefits arising from the net operating losses suffered after the acquisition of LFR are more closely related to the conduct of the directors managing LFR than the FSA directors' decision to acquire LFR. The many variables which made ascertainment, at the time of the decision to acquire LFR, of tax benefits from post-acquisition losses so doubtful and speculative as to remove them from the potential operation of the offsetting benefits rule also preclude finding a causal link between defen-

dants' alleged wrongdoing and any eventual tax benefit from those post-acquisition losses.

Finally, the court must determine whether the record on this summary judgment motion establishes as a matter of law that the tax savings which the offsetting benefits rule would permit in evidence actually equal or exceed any alleged losses. The court finds that genuine issues of material fact remain, which precludes an entry of summary judgment in defendants' favor. Thus, their motion is denied.

### B. $5,000,000 Loan

■ The damages claimed by the RTC includes an amount for an allegedly unpaid $5,000,000 loan FFS made to LFR in May of 1988. Defendants contend that the loan was repaid at the end of 1989 and as such is not a proper component of the damages calculation. The RTC contends that a year after the loan was made, FFS wrote off the entire $5,000,000 loan and converted the entire unpaid balance to equity in LFR Holdings. The RTC's expert witness has opined that neither the contemporaneous accounting records of FSC, FSA nor FFS show the $5,000,000 as repayment of the loan. The records of FSC and FSA both show a $5,000,000 capital contribution by FSC to FSA and the records of FFS show no payment being received from any source. He states that after examining these records, he is of the professional opinion that the entire $5,000,000 loan remains unpaid and is properly shown as an element of damages. The court finds that whether the loan was repaid is a fact question that is not capable of being resolved as a matter of law upon the papers submitted. Defendants' motion for summary judgment on this issue is therefore denied.

### C. $5,250,000 Advancement

Defendants also contend that the RTC's $5,250,000 advancement to the LFR bankruptcy estate in June of 1992, twenty-eight months after the RTC conservatorship was imposed on FSA, is not a proper element of its damage claim. Defendants argue that, as a matter of law, the advance to the bankruptcy estate was not proximately caused by any act or omission of the FSA directors. The

crux of defendants' argument is that it is the RTC, not the defendant directors, that made the decision to make a cash advance to the LFR bankruptcy estate. The first plan negotiated by defendant Fleischer would not have entailed a cash payment to the bankruptcy estate. Thus defendants argue it is the RTC's conduct in reevaluating the plan and its resulting decision to proceed with its own, different plan that caused the loss, not the defendant directors. They argue that the string of "but-fors" relied upon by plaintiff would stretch the concept of proximate cause beyond all legally acceptable bounds.

The court disagrees. The RTC has produced evidence to show that FSA would have had to contribute at least $30,000,000 in the form of irrevocable letters of credit as part of the LFR bankruptcy plan under the agreement negotiated by defendant Fleischer shortly before the imposition of a conservator. The court does not believe it stretches the concept of proximate cause beyond acceptable limits to permit the RTC to argue and to produce evidence at trial to show that the cash payment was required to be made in lieu of the $30,000,000 in irrevocable letters of credit and was a proximate result of defendants' negligence or fiduciary breach. In light of the many factual disputes surrounding the cash advancement, the issue of proximate cause is a matter for the jury. *See Durflinger v. Artiles,* 234 Kan. 484, 488, 673 P.2d 86 (1983) (causal connection between duty breached and injuries sustained is a question of fact); *McDermott v. Midland Management, Inc.,* 997 F.2d 768, 771 (10th Cir.1993) (issues involving proximate cause and foreseeability are ordinarily questions of fact for the jury under Kansas law).[5] The court finds that genuine issues of material fact exist with respect to the advance to the LFR bankruptcy estate and, thus, defendants' motion for summary judgment as to it is denied.

5. There is also evidence that $2,000,000 of cash was advanced with the expectation that FSA would obtain in return at least a $2,000,000 distribution from the bankruptcy estate. The RTC claims that at the time the damage calculation was prepared, it showed as a credit a remaining value of $2,490,000 which included the anticipated $2,000,000 recovery from the LFR

## V. CONCLUSION

The court finds that defendants have not met their burden to show that the RTC has suffered no injury or damage as a result of the directors' alleged negligence or breach of fiduciary duty as a matter of law. Genuine issues of material fact exist with respect to whether the RTC has suffered damages in connection with its claims in Counts VII and VIII of its first amended complaint.

**IT IS THEREFORE ORDERED BY THE COURT** that the motion of defendants Ernest M. Fleischer, Mary Louise Greene and John A. Scowcroft for summary judgment (Doc. # 419) is denied.

**IT IS SO ORDERED.**

bankruptcy. There is evidence tending to show that the $2,000,000 advance did not increase the net amount of plaintiff's damages since the final $40,000,000 damage calculation included a credit for the anticipated recovery from the LFR bankruptcy. Genuine issues of material fact exist with respect to this issue as well.